IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| FREDERICK M. RUSSAW, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 2:11-CV-611-WKW |
| | )              [WO] |
| BARBOUR COUNTY BOARD OF | ) |
| EDUCATION, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This suit is a Title VII retaliation action against the Barbour County Board of Education ("BCBOE" or "Board").  Plaintiff Frederick Russaw, who was employed by BCBOE as a transportation technician, alleges that his employment was non-renewed in retaliation for protected conduct.  BCBOE has moved for summary judgment on Mr. Russaw's Title VII claim of retaliation.  (Docs. # 28, 29.)  Mr. Russaw has responded in opposition to summary judgment (Doc. # 30), and BCBOE has replied (Doc. # 31).  The motion is ready for resolution.  Based upon careful consideration of the arguments of counsel, the relevant law, and the record as a whole, BCBOE's motion for summary judgment is due to be denied.

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 42 U.S.C. § 2000e-5(f)(3).  The parties do not contest personal jurisdiction or venue, and the court finds that there are allegations sufficient to support both.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Mr. Russaw brings this action against BCBOE for retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et. seq*. ("Title VII"). Mr. Russaw alleges that his employment as a transportation technician was non-renewed in retaliation for opposing what he perceived as his supervisor's unlawful employment practices against a bus driver, Ms. Lisa Rodgers.  That supervisor was Lee Roy Straw.  BCBOE contends, on the other hand, that Mr. Russaw's employment was non-renewed because he failed to perform his duties in a satisfactory manner, that Mr. Russaw did not engage in any conduct protected by Title VII, and that Mr. Russaw's non-renewal did not relate to his alleged protected activity.

Mr. Russaw's employment with BCBOE began when he was hired as a transportation technician for the 2008–09 school year.  As one of two transportation technicians in the maintenance department, Mr. Russaw performed manual labor on the school system's buses.  He was supervised by a tenured transportation technician

and Mr. Straw.  Mr. Straw wore two hats, serving not only as a supervisor of the transportation technicians, but also as the director of transportation.  (Quick's Dep. 65–66; Straw's Dep. 8–9.)

Ms. Rodgers worked as a bus driver for BCBOE the same three years as Mr. Russaw.  Mr. Straw was in her supervisory chain of command.  In the fall of 2009, Ms. Rodgers started giving her paperwork (including requests for bus repairs) to Mr. Russaw and making requests through him instead of directly to Mr. Straw.  Mr. Straw asked Mr. Russaw to inquire of Ms. Rodgers as to why she was not bringing her paperwork to him.  Ms. Rodgers told Mr. Russaw that Mr. Straw had been sexually harassing her, calling her at home, and trying to persuade her to have sex with him, but that "she didn't want to have anything to do with him."  (Pl.'s Dep. 29–30; Pl.'s Aff. ¶ 5.).

Mr. Russaw told Mr. Straw about Ms. Rodgers's accusations of sexual harassment.  Mr. Straw responded by laughing and said that he would never do anything like that.  That ended the conversation, and the topic never came up again. In this lawsuit, Mr. Russaw does not contend that he engaged in protected activity during this conversation.  (Pl.'s Summ. J. Resp. 7 n.6 (Doc. # 30).)

The alleged protected activity occurred in March 2010. As a preface, in early March 2010, Ms. Rodgers came through the gas line and told Mr. Russaw that she was having a problem with the front end of her bus. Mr. Russaw allegedly told Ms. Rodgers that she needed to report the matter to Mr. Straw at which time she claimed to have done so several times. Mr. Russaw then observed Ms. Rodgers putting a request for repairs in Mr. Straw's drop box. Not long after, on March 19, 2010, with her request for repairs having gone unanswered, Ms. Rodgers was transporting school children and had an accident after the bus's steering wheel locked up.

Mr. Russaw alleges that a day or so after Ms. Rodgers's accident, Mr. Straw asked Mr. Russaw if he saw Ms. Rodgers put a note for a bus repair in his drop box. Mr. Russaw said, "Yes, I [did] exactly [what] you told me to; have them to come up there and see you or either put a note in that drop box." (Pl.'s Dep. 60.) Mr. Straw instructed Mr. Russaw to deny, if ever asked, that he saw Ms. Rodgers put a note in the drop box "or else." (Pl.'s Dep. 60.) Mr. Russaw said that he would not lie. Mr. Russaw believed that when Mr. Straw asked him to deny that he had seen Ms. Rodgers place a repair request in her drop box, Mr. Straw "wanted [him] to lie so that he could either use the bus wreck as an excuse to fire Lisa Rodgers for not having had

4

sex with him, or . . . use it against her to force her to have sex with him."[1] (Russaw's Aff. ¶ 5.)

Mr. Russaw's belief that Mr. Straw had sexually harassed Ms. Rodgers was based upon what Ms. Rodgers had told him in the fall of 2009 and an additional incident he witnessed when he was fueling Ms. Rodgers's bus at the maintenance shop. As to this additional incident, Mr. Russaw saw Mr. Straw enter the parked bus where Ms. Rodgers was seated during the fueling process. He then saw Mr. Straw put his hand on Ms. Rodgers's inner, upper thigh, and heard Ms. Rodgers rebuke him with strong language. Later that same day, Mr. Russaw observed Mr. Straw removing the videotape from the bus, destroying it, and throwing it in a trash can. (Pl.'s Dep. 32–38.) Mr. Russaw cannot remember precisely when this incident occurred, other than it occurred a "while after" Ms. Rodgers told him about Mr. Straw's sexually harassing behavior.[2] (Pl.'s Dep. 57–58.) On another occasion prior to Ms. Rodgers's bus accident, Mr. Russaw saw Mr. Straw place "what appeared to be a greeting card" in Ms. Rodgers's bus, but he admits that he does not know any other details, and he never asked Ms. Rodgers about it. (Pl.'s Dep. 39; Pl.'s Aff. ¶ 5.)

---

[1] This incident will be referred to occasionally in this opinion as the "drop box incident."

[2] Ms. Rodgers narrows the time frame to the second semester, or at the earliest, late December 2009. (Rodgers's Dep. 91.)

Mr. Russaw's belief that Mr. Straw desired to retaliate against Ms. Rodgers for refusing his sexual advances is based upon the following. The first was Mr. Russaw's impression, based upon what Ms. Rodgers reported to him and what he witnessed, that Mr. Straw had sexually harassed Ms. Rodgers. The second was Mr. Straw's ranting, occurring "within a couple of months" of Ms. Rodgers's bus accident, that Ms. Rodgers was a "'bitch' and a 'slut,' and that he had 'a way to deal with her.'" (Pl.'s Aff. ¶ 2.) The third was Ms. Rodgers's reports to Mr. Russaw that she had submitted several requests to Mr. Straw for repair work to her bus, but that those requests had been ignored. (Russaw's Aff. ¶ 3.)

Less than two months after the drop box incident, Mr. Russaw's employment contract was non-renewed based upon Mr. Straw's recommendation to the superintendent who, in turn, passed along the recommendation to BCBOE. During all times relevant to this lawsuit, Gary Quick was the superintendent of Barbour County Schools. During Mr. Quick's tenure as superintendent, under the protocol in place, the employee's supervisor was required to make a recommendation of non-renewal to Mr. Quick within specified time frames. (Quick's Dep. 12–13.) Mr. Quick then was responsible for making recommendations for all employment actions, including employment renewals, to BCBOE, and BCBOE would vote on the recommendations.

6

The transportation department in which Mr. Russaw worked received a negative report after an annual state safety inspection in the spring of 2010. After this inspection and in accordance with the established protocol, Mr. Straw recommended to Mr. Quick that Mr. Russaw's employment not be renewed at the end of the 2009–10 school year.[3] There is some inconsistency as to what information Mr. Straw conveyed to Mr. Quick at the time he made the recommendation. Mr. Straw contends that he cited job performance issues related to Mr. Russaw's safety inspections of the bus fleet. (Straw's Dep. 23.) Mr. Quick says that Mr. Straw gave no reason at that time for his recommendation and that he did not ask Mr. Straw any questions as to his reason for the recommendation. Mr. Quick asserts, however, that he had personal "knowledge of why," namely, the maintenance department's substandard "safety records and the [state inspection] reports of [the] safety readiness of [bus] fleet." (Quick's Dep. 35.) Additionally, according to Mr. Quick, he frequently visited the bus maintenance shop, knew the employees, conversed regularly with Mr. Straw about bus maintenance problems, and often "talked collectively" with Mr. Straw and the mechanics on a variety of topics, including the results of the annual inspections and ways to improve efficiency. (Quick's Dep. 22–27, 31.) Additionally, at some

---

[3] Mr. Straw also recommended nonrenewal of Ms. Rodgers's employment. (Straw's Dep. 27; Quick's Dep. 13.) She, like Mr. Russaw, was a probationary employee. (Def.'s Resp. to Pl.'s Interrog. No. 6.)

point prior to Mr. Straw's recommendation to non-renew Mr. Russaw's employment, Mr. Straw had reported to Mr. Quick "some problems with Mr. Russaw," including a timecard issue and job shortcomings, although those shortcomings were not discussed in any detail.  (Quick's Dep. 26.)

Based upon Mr. Straw's recommendation, Mr. Quick recommended to BCBOE that Mr. Russaw's employment as a transportation technician not be renewed, and on May 10, 2010, BCBOE voted in accordance with that recommendation.  There are no details in the record as to what information Mr. Quick relayed to BCBOE or what transpired during the BCBOE meeting when the vote for non-renewal occurred.  There is evidence, however, that neither Mr. Quick nor any member of BCBOE knew about the drop box incident.

In a letter dated May 11, 2010, Mr. Quick informed Mr. Russaw of BCBOE's vote to non-renew his contract for the 2010-11 school year.  BCBOE says that it is not required to provide any reason for termination to a non-tenured employee,[4] and, thus, the letter to Mr. Russaw contained none.  However, BCBOE contends that the

---

[4] BCBOE submits that because Mr. Russaw was a probationary employee, BCBOE was not required to give Mr. Russaw any reason for non-renewing his employment and that his non-renewal was governed by Alabama Code § 36-26-101, which although now repealed, was in effect at the time Mr. Russaw's employment was non-renewed.  That statute provided that during an employee's probationary period, the employing authority could remove the employee simply "by furnishing said employee written notification at least 15 days prior to the effective day of termination." § 36-26-101.

reason was based upon Mr. Russaw's failure to perform his duties in a satisfactory manner, in particular, his failure to properly inspect the buses. Moreover, because of these alleged work performance issues, there was apparently a belief, shared between Mr. Straw and Mr. Quick, that Mr. Russaw should be terminated before he gained tenure. (*See* Def.'s Summ. J. Br. 14; Straw Aff. ¶ 6.) Mr. Russaw claims that this reason is false in part because he was not yet certified to inspect buses and, thus, was permitted only to perform inspection tasks at the direction and alongside the certified senior transportation technician. (Pl.'s Dep. 83–84.)

In May 2010, after he received the letter from BCBOE that his employment contract had been non-renewed, Mr. Russaw approached Mr. Quick and intended to tell Mr. Quick about Mr. Straw's treatment of Ms. Rodgers and about how he had tried to make him lie about the repair request. However, Mr. Russaw was unable to convey any of this information to Mr. Quick because Mr. Quick cut him off and said, in essence, that he supported any decision made by Mr. Straw. (Pl.'s Dep. 63–65, 74–80.) The conversation ended without Mr. Russaw conveying any information about Mr. Straw's alleged sexual harassment of Ms. Rodgers or the drop box incident. In this lawsuit, Mr. Russaw contends that this "attempt to report" Mr. Straw's alleged unlawful employment practice to Mr. Quick also is protected conduct for which he suffered retaliation. (Pl.'s Summ. J. Resp. at 11–13.)

9

### III.  STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under Rule 56, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.  "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Rule 56(e)(2).  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

10

(1986).  A genuine factual dispute exists if "a reasonable jury could return a verdict for the non-moving party."  *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks and citation omitted).

## IV.  DISCUSSION

When a Title VII retaliation claim is based upon circumstantial evidence, as in this case, the court applies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to resolve a summary judgment motion.  *See Wright v. Southland Corp.*, 187 F.3d 1287, 1305 (11th Cir. 1999).  To establish a *prima facie* case of retaliation, which is the first step under that framework, the plaintiff must show (1) that "he engaged in statutorily protected activity," (2) that "he suffered an adverse employment action," and (3) that "there was some causal relation between the two events."  *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).  After the plaintiff has established the elements of the *prima facie* case, the employer must articulate a legitimate, non-retaliatory reason for the challenged employment action.  *Id.*  Ultimately, to avoid summary judgment, the plaintiff must raise a genuine issue of material fact that the employer's articulated reason was pretextual.  *See Chapman*, 229 F.3d at 1024–25.  The plaintiff may establish pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

11

legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005).

## A.   *Prima Facie* Case

There is no dispute that Mr. Russaw was subjected to an adverse employment action when his employment with BCBOE was non-renewed.  Elements one and two of the *prima facie* case are in dispute, however.

### 1.   *Statutorily Protected Expression*

Title VII provides that it is an "unlawful employment practice" for an employer to discriminate against an employee who (1) "has opposed any practice made an unlawful employment practice by this subchapter" (the "opposition clause"), or (2) "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (the "participation clause").  42 U.S.C. § 2000e-3(a).  Mr. Russaw's retaliation claim is based upon the opposition clause.

To show statutorily protected expression under the opposition clause, the employee must demonstrate (1) that "'he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices [under Title VII]'" and (2) that he opposed the unlawful employment practices.  *Howard v. Walgreen Co.*,

12

605 F.3d 1239, 1244 (11th Cir. 2010) (quoting *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)); *see also* 42 U.S.C. § 2000e-3(a) (defining an "unlawful employment practice" in the context of retaliation claims). The employee's belief that the employer engaged in an unlawful employment practice must be "'*objectively* reasonable in light of the facts and record present.'" *Howard*, 605 F.3d at 1244 (quoting *Little*, 103 F.3d at 960). The conduct the employee opposed need not have been "actually unlawful"; however, the reasonableness of the employee's belief "must be measured against existing substantive law." *Id.* (quoting *Clover v. Total Sys. Serv., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999)).

Moreover, in *Crawford v. Metropolitan Government of Nashville and Davidson County*, the Supreme Court considered what may constitute opposition in the context of a Title VII retaliation claim. 555 U.S. 271 (2009). In that case, the Supreme Court held than an employee's speech about sexually harassing behavior in response to an employer's internal investigation constituted opposition under the Title VII retaliation framework. The Court explained that "[t]he term 'oppose,' being left undefined by the statute, carries its ordinary meaning, to resist or antagonize . . . ; to contend against; to confront; to resist; withstand." *Id.* at 276 (internal citation and quotation marks omitted). The Court found that the plaintiff's account of a fellow employee's sexually harassing behavior was "an ostensibly disapproving account of sexually

13

obnoxious behavior toward her by a fellow employee" and therefore "covered by the opposition clause." *Id.* The Court further held that even though the plaintiff's speech came as a response to an employer's question, it still constituted opposition just as "standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons" constitutes opposition. *Id.* at 277.

BCBOE argues that Mr. Russaw has not shown that he engaged in protected activity in the form of opposing a perceived unlawful employment practice. It contends that Mr. Russaw merely relayed to Mr. Straw that Ms. Rodgers had said that Mr. Straw had sexually harassed her and did not voice any opposition to that alleged sexual harassment. Mr. Russaw concedes that the discussion between him and Mr. Straw about Ms. Rodgers's accusations of sexual harassment against Mr. Straw did not rise to the level of protected conduct or, in other words, was not opposition to perceived sexual harassment. (Pl.'s Summ. J. Resp. 7 n.6.) Mr. Russaw argues, however, that by refusing to deny, if ever asked, that he saw Ms. Rodgers place a repair request in Mr. Straw's drop box, his behavior constituted opposition. He contends that his pronouncement to Mr. Straw that he would not lie for Mr. Straw fits within the realm of opposing sexual harassment because he was opposing what he perceived to be a retaliatory act by a supervisor against a subordinate who had rejected his sexual advances. (Pl.'s Summ. J. Resp. 8; Pl.'s Aff. ¶ 4 ("I believed at

14

that time that [Mr.] Straw wanted me to lie so that he could either use the bus wreck as an excuse to fire Lisa Rodgers for not having had sex with him, or to use it against her to force her to have sex with him.").)

Not surprisingly, BCBOE disagrees.  It contends that an employee's statement that he "will not lie" when asked to cover up an employee's request to a supervisor for an equipment repair is not "protected conduct" for purposes of a Title VII retaliation claim.  BCBOE argues that, at best, Mr. Russaw is claiming that he was "terminated for refusing to lie for [Mr. Straw], not for opposing discrimination/harassment" and that, therefore, "one never reaches the determination of whether [Mr.] Russaw had a 'good faith belief' he was opposing discrimination." (Def.'s Summ. J. Br. 11.)

Viewed in the light most favorable to Mr. Russaw, Mr. Russaw's refusal to lie about Ms. Rodgers's request seeking bus repairs (a request that, had it not been ignored, arguably would have prevented the accident) cannot be viewed in isolation, but must be viewed in light of the totality of the circumstances.  There  is some support in the case law for Mr. Russaw's theory.  Namely, the Eleventh Circuit has noted that when "a supervisor retaliates against a worker for failing to give in to sexual advances, those advances will rise to the level of 'severe or pervasive'"

sufficient to support an actionable sexual harassment claim.[5]  *Johnson v. Booker T. Wash. Broad. Serv.*, 234 F.3d 501, 508 (11th Cir. 2000).  In this case, the analysis of whether Mr. Russaw's refusal to lie amounts to opposition of the type noted in *Johnson* is akin to peeling the layers off an onion to see if protected conduct is at its core.

The layers begin with the allegations of sexual harassment.  Mr. Russaw was privy to Ms. Rodgers's accusations that during the school year, Mr. Straw had sexually propositioned Ms. Rodgers more than once and that Ms. Rodgers had rejected those propositions.  Later in the school year but prior to Mr. Straw's demand that Mr. Russaw lie about Ms. Rodgers's repair request, Mr. Russaw witnessed an incident of intentional, inappropriate touching by Mr. Straw against Ms. Rodgers, which Mr. Russaw knew to be unwelcomed by Ms. Rodgers.  Around the same time, Mr. Russaw also was in earshot of Mr. Straw's use of sexually degrading epithets to describe Ms. Rodgers and Mr. Straw's statement that he had "'a way to deal with [Ms. Rodgers].'"  (Pl.'s Aff. ¶ 2.)  The culmination of that harassment, in Mr. Russaw's mind, was Mr. Straw's request that he lie about the repair request so as to create the

---

[5] Based upon Mr. Russaw's argument and affidavit, it need not be decided whether a perception that Mr. Straw was subjecting Ms. Rodgers to a retaliatory hostile work environment would have been reasonable.  The reasonableness of that perception would have required close scrutiny.  *See Ekokotu v. Fed. Exp. Corp.*, 408 Fed. App'x 331, 339 (11th Cir. 2011) (noting that "the cognizability of a retaliatory hostile work environment claim under Title VII" has not been decided in this circuit).

16

impression that Ms. Rodgers committed a serious infraction by not requesting repairs to her bus.  The court is hesitant to find as a matter of law at this stage that Mr. Russaw did not hold an objectively reasonable belief that Ms. Rodgers had been sexually harassed by her supervisor and that Mr. Straw intended to strike back at her for rejecting his advances.  *See Clover*, 176 F.3d at 1351 (The perceived sexual harassment need not "actually be sexual harassment, but it must be close enough to support an objectively reasonable belief that it is.").

BCBOE nonetheless suggests that there is no link between the alleged sexual harassment and Mr. Straw's purported request to Mr. Russaw to coverup the fact that Ms. Rodgers had made a repair request.  This leads to the layer of temporal nexus. There is some evidence suggesting a sufficiently close temporal connection. Mr. Russaw initially learned from Ms. Rodgers that Mr. Straw had sexually propositioned her in the fall of 2009, at the earliest "about six months" prior to Mr. Straw's asking him to lie about Ms. Rodgers's repair request.  (Pl.'s Dep. 29.)  If that was all, the temporal proximity might be too attenuated, but Ms. Rodgers has pinpointed the date that Mr. Straw touched her inner thigh as occurring in the second semester of the 2009–10 school year, or, at the earliest, at the end of December 2009.  It arguably would be reasonable for Mr. Russaw to have believed that the conduct he witnessed was a continuation of sexually harassing conduct.  The continuation of the conduct occurred sufficiently close in time to Mr. Straw's request to Mr. Russaw to lie, made

less than three months later, to support an inference that Mr. Russaw reasonably believed that the request to lie was connected to Ms. Rodgers's refusal to accede to Mr. Straw's sexual advances.  *See infra* Part IV.C (discussing the requirement of temporal proximity in retaliation cases).

Given what Mr. Russaw knew, there is a genuine issue of material fact with respect to whether it was objectively unreasonable for him to have believed that retaliation was the motive, even if it could be argued that non-retaliatory, non-discriminatory motives were at play (*e.g.*, a motive by Mr. Straw simply to cover up the fact that he had abdicated his supervisory responsibilities by ignoring a subordinate's bus repair request).  The lack of clarity in the record as to Mr. Straw's motives is another layer that demonstrates why a genuine issue of material fact exists as to whether Mr. Russaw can establish that he engaged in protected conduct.  *See Bennington*, 261 F.3d at 1268 (observing that the absence of clear facts as to the decisionmaker's retaliatory bias created a material issue of fact with respect to the plaintiff's Title VII retaliation *prima facie* case).

Having exposed the layers – the multiple instances of Mr. Straw's alleged sexual harassment against Ms. Rodgers (including an inappropriate touching), Mr. Straw's gender-derogatory name calling of Ms. Rodgers, Mr. Straw's arguably retaliatory-infused statements, and the temporal nexus between the alleged sexual harassment and the drop box incident – the court finds that the facts are sufficient to

18

support the inference that, in refusing to lie for Mr. Straw about Ms. Rodgers's request for a bus repair, Mr. Russaw resisted or withstood Mr. Straw's efforts to retaliate against Ms. Rodgers for her refusal to accede to his sexual advances. Mr. Russaw's act of refusing to acquiesce in his supervisor's request, therefore, is sufficient to create a genuine issue of material fact as to whether Mr. Russaw opposed sexual harassment in refusing to coverup Ms. Rodgers's repair request. It may be that this argument is not a strong one, but it is a plausible one argued by Mr. Russaw, and it finds support in *Johnson*. Significantly, these finer points have not been addressed by BCBOE, which takes the position that "one never reaches the determination of whether [Mr.] Russaw had a 'good faith belief' he was opposing discrimination." (Def.'s Summ. J. Br. 11.)   For these reasons, the court finds Mr. Russaw has demonstrated protected conduct sufficient to survive summary judgment as to this element of his *prima facie* case.

Mr. Russaw's alleged attempt to report Mr. Straw's unlawful employment practices against him to Mr. Quick requires a different conclusion. First, the conversation occurred after BCBOE's decision to non-renew. It could not have been a motivating factor. Second, it is undisputed that during his conversation with Mr. Quick, Mr. Russaw did not express opposition to any unlawful unemployment practice by Mr. Straw. Generally, to engage in protected activity, an employee must "'at the very least, communicate [his or] her belief that discrimination [or retaliation]

is occurring to the employer,' and cannot rely on the employer to 'infer that discrimination has occurred.'" *Demers v. Adams Homes of NW. Fla., Inc.*, 321 F. App'x 847, 852 (11th Cir. 2009) (quoting *Webb v. R & B Holding Co.*, 992 F. Supp. 1382, 1390 (S.D. Fla. 1998)).  Mr. Russaw argues, however, that he is excused from that failure because Mr. Quick knew that he was "attempt[ing] to report something to him about [Mr.] Straw," but prevented Mr. Russaw from doing so.  (Pl.'s Resp. to Summ. J. 13.)  In support of his argument, Mr. Russaw cites two pages from Mr. Quick's deposition transcript, in which Mr. Quick testified that Mr. Russaw mentioned that Mr. Straw "was hard to work for" and "hard to talk to," but that he did not mention any specific incidents or individuals.  (Quick's Dep. 36–37.)

It cannot reasonably be inferred from Mr. Quick's deposition testimony that he had any knowledge that the purpose of Mr. Russaw's confrontation with him was to report an unlawful employment practice.  There is no suggestion in this testimony that, prior to being interrupted and cut off by Mr. Quick, Mr. Russaw gave any indication that the "something" he wanted to report was an unlawful employment practice and not just a general protest that Mr. Straw was a difficult supervisor.  No reasonable person could find that Mr. Russaw's complaint to Mr. Quick about his supervisor suggested anything more than a workplace civility complaint, and as the Supreme Court has said more than once, Title VII is not a "'general civility code for the American workplace.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53,

68 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).   Accordingly, Mr. Russaw has failed to create a genuine issue of material fact that he engaged in protected conduct during his discussion with Mr. Quick.

## B.   <u>Causal Relation</u>

Mr. Russaw also must demonstrate a causal connection between the protected conduct and the non-renewal of his employment. *Goldsmith*, 513 F.3d at 1277. The Eleventh Circuit has explained that the causal element for a claim of retaliation can be proved by circumstantial evidence:

> We do not construe the "causal link" . . . to be the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action . . . .   Rather, we construe the "causal link" element to require merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated.

*Id.* (quoting *Simmons v. Camden Cnty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985)).   This causal link requirement is less stringent than "but for" causation: "[E]stablishing a causal link does not require showing the protected activity was the sole motivating factor for the adverse employment action." *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002).

"[T]o show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action," *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d

791, 799 (11th Cir. 2008), and that there is a "'close temporal proximity' between the protected expression and [the] adverse . . . action.'"  *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (quoting *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003)).  The knowledge "requirement rests upon common sense.  A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart*, 231 F.3d at 799.  "[U]nrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct" generally extinguishes any causal connection between the protected activity and the adverse employment action.  *Id.*

### 1.    *Temporal Proximity*

Mr. Russaw's protected conduct occurred on March 21, 2010, and his employment was non-renewed on May 10, 2010.  There was, therefore, a seven-week time period between the protected conduct and the adverse employment action.  There is Eleventh Circuit authority that a two-month gap between the adverse employment action and the protected conduct is sufficient to support a *prima facie* case of causation based on close temporal proximity.  *See Robinson v. LaFarge N. Am., Inc.*, 240 Fed. App'x 824, 829 (11th Cir. 2007) (citing *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1291 (11th Cir. 2000)).  BCBOE has not argued otherwise. (Def.'s Summ. J. Br. 13–14.)   Temporal proximity is, therefore, satisfied; however, temporal

proximity must be accompanied by the employer's knowledge of the protected activity in order for the *prima facie* case to be complete.

### 2.   *Knowledge*

BCBOE argues that neither its members nor Mr. Quick knew about Mr. Russaw's protected activity.  With this much, the court agrees.  First, there is evidence that when Mr. Quick recommended Mr. Russaw's non-renewal to the members of BCBOE, he was unaware of Mr. Russaw's protected activity, *i.e.*, that Mr. Russaw had refused Mr. Straw's demand to disavow any knowledge that Ms. Rodgers had put a repair request in the drop box.  (Quick's Dep. 36–39.)  Mr. Russaw has not submitted any contrary evidence.  As discussed in Part IV.A. *supra* Mr. Russaw concedes that when he spoke to Mr. Quick in May 2010, he did not divulge any information factually relevant to his retaliation claim.  Even if had, a review of Mr. Russaw's deposition testimony reveals that the conversation he had with Mr. Quick occurred *after* Mr. Russaw had received his letter of non-renewal and, thus, *after* the decision had been made to non-renew his employment.  Hence, this conversation is not pertinent for discerning what knowledge, if any, Mr. Quick or the Board had about Mr. Russaw's protected activity at the time the decision was made to non-renew his employment.  *See Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999) ("At a minimum, [an employee] must show that the adverse act followed the protected conduct; this minimum proof stems from the important

requirement that 'the employer was actually aware of the protected expression at the time it took adverse employment action.'" (quoting *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993))).   Additionally, Mr. Russaw has offered no evidence from which it can be inferred that Mr. Straw notified Mr. Quick of any facts pertinent to Mr. Russaw's allegations that form the basis of his retaliation claim. Likewise, there is no evidence from which it can be inferred that Mr. Quick had independent knowledge of the drop box incident upon which Mr. Russaw relies to argue that Mr. Straw's recommendation was steeped in retaliatory animus.

Second, there is evidence that at the time BCBOE made its decision, none of its members knew that Mr. Russaw had engaged in conduct that could be characterized as Title VII opposition.  (*See, e.g.*, Def.'s Resp. to Pl.'s Interrog. No. 8 (Doc. # 30-11).)  Mr. Russaw has not argued to the contrary, and he also has admitted that he did not have any discussions with any BCBOE member concerning Mr. Straw, the drop box incident, or any other topic surrounding his employment. (Pl.'s Dep. 81.)  In sum, Mr. Russaw has not presented any evidence that raises a genuine issue of material fact on the issue of Mr. Quick's or BCBOE's knowledge of his protected activity.

### 3.      *Cat's Paw Causation Theory*

This does not end the analysis, however.  Mr. Russaw implicitly relies on a "cat's paw" theory of causation by arguing, in essence, that Mr. Straw infected the decision making process with retaliatory bias.  Mr. Russaw contends that Mr. Straw harbored retaliatory intent against Mr. Straw for Mr. Russaw's having opposed Mr. Straw's alleged sexual harassment of Ms. Rodgers, that Mr. Straw's recommendation to non-renew Mr. Russaw's contract was motivated by that retaliatory intent, that Mr. Quick accepted that recommendation at face value, and that ultimately the recommendation was adopted *carte blanche* by the Board.[6]

Under the cat's paw theory of causation, even if neither Mr. Quick nor the Board was aware of the protected conduct, the causal link requirement can be satisfied if Mr. Russaw's retaliatory motive influenced BCBOE's decision to renew. *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (describing the cat's paw theory of discriminatory motive).  In *Stimpson*, the Eleventh Circuit explained that under the "cat's paw" theory of causation, the decisionmaker takes an adverse employment action against an employee based upon the biased recommendation of a non-decision maker without conducting an independent

---

[6] Mr. Russaw describes Mr. Straw as the "ultimate decisionmaker."  While BCBOE, not Mr. Straw, technically held that role, the court understands Mr. Russaw to argue that Mr. Straw was the true decision maker in that the Board was the "mere conduit" of Mr. Straw's discriminatory animus.

investigation and, thus, the recommender uses the "decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.*

Last year, the Supreme Court declined to adopt a "hard-and-fast" cat's paw rule that automatically insulates decisionmakers who make independent investigations. It recognized nonetheless that "[i]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action," the employer is not liable. *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1193 (2011). However, "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified."[7] *Id.*

Here, Mr. Russaw has demonstrated a genuine issue of material fact with respect to whether Mr. Straw's actions were a causal factor in the non-renewal of his

---

[7] *Staub* involved a claim of employment discrimination under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). Although this court uncovered no post-*Staub* published opinion from the Eleventh Circuit addressing the cat's paw theory in the context of a Title VII retaliation claim, the court finds that it is appropriate to analyze the "cat's paw" theory under *Staub*'s precepts. The *Staub* Court itself recognized similarities between USERRA and Title VII. *Staub*, 131 S. Ct. at 1191. Moreover, in an unpublished opinion, on an appeal from summary judgment in favor of an employer in a Title VII/§ 1981 discrimination case, the Eleventh Circuit discussed *Staub*'s holding with respect to the cat's paw theory, but found it unnecessary to "explore the precise meaning or reach of *Staub*" because it was clear that the firing decision "did not rely at all on anything" the biased recommender said. *Brooks v. Hyundai Motor Mfg. Ala., LLC*, 444 Fed. App'x 385, 387 (11th Cir. 2011). Moreover, *Staub*'s cat's paw theory has been applied in Title VII cases by other circuit courts of appeal. *See Davis v. Omni-Care, Inc.*, No. 10-3806, 2012 WL 1959367, at *7 & n.8 (6th Cir. 2012); *Bissett v. Beau Rivage Resorts, Inc.*, No. 11-60239, 2011 WL 4398135, at *1 (5th Cir. Sept. 22, 2011); *McKenna v. City of Philadelphia*, 649 F.3d 171, 177−78 (3d Cir. 2011); *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189 (10th Cir. 2011).

employment.  During Mr. Quick's tenure as superintendent, it is undisputed that supervisors, such as Mr. Straw, were given a substantial measure of authority over their subordinates' continued employment.  Specifically, Mr. Quick testified that Mr. Straw's responsibilities included recommending the "renewal or nonrenewal" of the employment of his subordinates, which included Mr. Russaw, and Mr. Quick expected Mr. Straw to make appropriate personnel recommendations to him within set time frames.  (Quick's Dep. 12–13.)  Pursuant to that authority vested in him, Mr. Straw recommended that Mr. Russaw's employment be non-renewed, and Mr. Quick accepted that recommendation with no questions asked at that time.  (Mr. Quick's Dep. 34–35.)

On one hand, it is clear that Mr. Quick was keenly aware that the transportation department had received a failing report from a state inspection on safety issues with respect to the school system's buses and that this evaluation factored into Mr. Quick's decision to affirm and pass along to BCBOE Mr. Straw's recommendation to non-renew Mr. Russaw's employment.  On the other hand, on this record, Mr. Quick's reliance on the state inspection results is insufficient under *Staub* to amount to an intervening superseding cause.  That is so because there also is evidence that Mr. Quick factored into his decision Mr. Russaw's alleged job deficiencies that were reported to him solely by Mr. Straw (the biased supervisor).  (*See, e.g.*, Def.'s Resp. to Pl.'s Interrog. No. 11 ("From discussions with [Mr.] Straw . . . [Mr.] Quick was

27

generally aware of concerns Mr. Straw had with the job performance of [Mr. Russaw] with regard to safety of the buses.").)  Mr. Quick admits that Mr. Straw periodically discussed with him in generalities Mr. Russaw's alleged job deficiencies, deficiencies which Mr. Russaw disputes, and there is no evidence that Mr. Quick made any kind of independent assessment of Mr. Russaw's work quality.  (*See* Quick's Dep. 35 (admitting that he had no knowledge of any "particular instances" of when Mr. Russaw had not performed his job properly).)  Rather, from aught that appears, Mr. Quick took those reports from Mr. Straw at face value.  Based upon this evidence and under *Staub*, Mr. Straw's recommendation set in motion the events that resulted in Mr. Russaw's employment being non-renewed.  As discussed above, there is a genuine issue of material fact with respect to whether Mr. Straw harbored retaliatory intent, and there is insufficient evidence of independent action by Mr. Quick to eliminate Mr. Straw's retaliatory animus as a causal factor of the non-renewal of Mr. Russaw's employment.  The evidence is not overwhelming in Mr. Russaw's favor and admittedly it is somewhat murky, but it nonetheless is sufficient to create a genuine issue of material fact as to whether Mr. Quick's independent investigation and knowledge resulted in a recommendation from him that was wholly unrelated to Mr. Straw's alleged biased recommendation.  *See Staub*, 131 S. Ct. at 1193.

Moreover, the record is sufficiently unclear as what independent investigations BCBOE undertook, if any, before voting in favor of the recommendation to non-

renew Mr. Russaw's employment.  It contends that Mr. Russaw's deficient job performance is the reason for his non-renewal, but it provides no explanation as to how it reached that conclusion.  Because it is not clear from the summary judgment evidence whether the Board made an independent decision sufficient to break the causal link, a genuine issue of material facts exists as to whether Mr. Russaw has established causation based upon cat's paw liability.

In sum, there is a triable issue with respect to whether Mr. Straw's retaliatory animus may be imputed to Mr. Quick, who recommended Mr. Russaw's termination, and BCBOE, which actually non-renewed Mr. Russaw.  Accordingly, there is a genuine issue of material fact of a causal connection based on the inference created by the temporal proximity between the protected conduct and the adverse employment action and the causal inference created by the cat's paw theory.  It admittedly is a close call, but on summary judgment, close calls go to the non-moving party.

## C.   <u>Pretext</u>

The inquiry turns to whether BCBOE can produce a legitimate, non-retaliatory reason for its decision to non-renew Mr. Hicks's employment and whether Mr. Hicks can demonstrate that BCBOE's proffered reason was pretext for retaliation.

BCBOE's articulated reasons for non-renewing Mr. Russaw's employment are that "without non-renewal, [Mr.] Russaw would have gained tenure" and that based

upon Mr. Russaw's "continuing work performance issues, he could not be allowed to gain tenure."  (Straw's Aff. ¶ 4; Quick's Dep. 34.)  On these bases, BCBOE's position is that Mr. Straw recommended the non-renewal of Mr. Russaw's employment and that Mr. Quick "had personal knowledge of the truth of those reasons." (Quick's Dep. 34.)

Here, the court assumes, without deciding, that BCBOE meets its burden of "clearly set[ting] forth, through the introduction of admissible evidence, the reasons for [Mr. Russaw's] [termination]."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).  An employee's unsatisfactory work performance can constitute a legitimate, non-retaliatory reason for terminating an employee.  *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). Moreover, there is nothing, in and of itself, retaliatory with respect to an employer's desire to terminate an employee with an unsatisfactory work record during his or her probationary period.  However, with that said, it has not gone unnoticed that Mr. Quick was unable to identify any particular shortcomings in Mr. Russaw's work and admitted that Mr. Straw did not provide him with specific examples of Mr. Russaw's alleged poor work quality.  This lack of specificity has factored into the decision on pretext.

Here, Mr. Russaw argues that there is sufficient evidence of pretext to permit his claims to proceed to trial.  Mr. Russaw relies on Mr. Straw's "or else" statement

as forecasting retaliation (*i.e.*, deny that you saw Ms. Rodgers put a note in the drop box "or else"), the fact that Mr. Straw recommended only the non-renewal of Mr. Russaw's and Ms. Rodgers's employment contract, the absence of written reprimands "regarding poor bus inspections" by Mr. Russaw, evidence that a state inspector had warned Mr. Straw that Mr. Russaw was not qualified to conduct school bus inspections because of his lack of certification, the fact that a certified senior transportation technician was not disciplined for his role in the bus inspections, and what Mr. Russaw contends are conflicting reasons for his termination.  (Doc. # 30, at 13-17.)

Having considered the totality of the circumstances, construed all reasonable evidentiary inferences in Mr. Russaw's favor, and studied Mr. Russaw's arguments, the court concludes that there is a genuine issue of material fact on the issue of pretext.  It may be that there are a number of permissible and non-retaliatory inferences to be derived from the evidence, but there are a sufficient number of impermissible inferences, when considered collectively, to raise a genuine issue of material fact for trial.  There was a supervisor with presumed retaliatory intent who recommended the termination of his subordinate based upon arguably vague grounds that have been adequately refuted, but that were passed along and adopted without reasoned explanation or independent probing.  The evidence distinguishes this case from those where the employer is absolved from liability based upon its "mistaken

31

but honest impression that the employee violated a work rule." *Damon*, 196 F.3d

at 1363.  At the very least, on this record, the court is persuaded that "the better

course would be to proceed to a full trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255 (1986).  Summary judgment will be denied.

## V.  CONCLUSION

Because Mr. Russaw has raised a genuine issue of material fact with respect

to his *prima facie* case and pretext on his Title VII retaliation claim, it is ORDERED

that BCBOE's motion for summary judgment (Doc. # 28) is DENIED.

An order setting this case for trial will be entered separately.

DONE this 28th day of August, 2012.

/s/ W. Keith Watkins
_____
CHIEF UNITED STATES DISTRICT JUDGE
